**David VanSpeybroeck**, OSB #954440
E-mail: david.vanspeybroeck@bullivant.com
**Dayna J. Christian**, OSB #973360
E-mail: dayna.christian@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915
Attorneys for Aequitas Equipment Finance,
LLC



FILED'08 JUN 20 15:34USDC-ORP

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| AEQUITAS EQUIPMENT FINANCE, LLC, an Oregon limited liability company, | Civil No.: **CV '08 - - 750 - AC** |
| Plaintiff, | **COMPLAINT** |
| v. | **Demand for Jury Trial** |
| VIVATO NETWORKS, INC.; a Delaware corporation and VIVATO NETWORKS HOLDINGS, INC., a Delaware corporation, | |
| Defendants. | |

Plaintiff alleges and complains as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Aequitas Equipment Finance, LLC, ("Aequitas") is an Oregon limited liability company, qualified and licensed to do business in the State of Oregon, and has fulfilled all conditions precedent to maintenance of this action.

2.     Defendant Vivato Networks, Inc. ("VNI") is a Delaware corporation, doing business in Oregon.

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351

#21796

**COMPLAINT**
**Page 1**

3.      Defendant Vivato Networks Holdings, Inc. ("VHI") is a Delaware corporation, doing business in Oregon.

4.      Jurisdiction is proper in this Court pursuant to 28 USC § 1332 in that there is diversity of citizenship. The amount in controversy exceeds $75,000 exclusive of costs and interest.

5.      Venue is proper in this court pursuant to 28 USC § 1397 because defendants have sufficient minimum contacts with the State of Oregon.

## FACTUAL ALLEGATIONS

6.      On or about November 30, 2007, VNI entered into a Business Loan Agreement with Aequitas Capital Management, Inc. ("ACM") to borrow money (the "Loan Agreement"). ACM, Aequitas, VNI and Catcher Holdings, Inc. ("Catcher"), a company which intended to acquire VNI, entered into a Loan Assignment and Acceptance (Vivato Networks, Inc.) dated November 30, 2007 ("Loan Assignment"), pursuant to which Aequitas became the Lender under the Loan Agreement and all related loan and security documents. A true and correct copy of the Loan Agreement is attached as Exhibit A and incorporated herein by reference. A true and correct copy of the Loan Assignment is attached as Exhibit B and incorporated herein by reference.

7.      In connection with the execution of the Loan Agreement, on or about November 30, 2007, VNI executed a Promissory Note evidencing the loan (the "Note"). A true and correct copy of the Note is attached as Exhibit C and incorporated herein by reference.

8.      In connection with the execution of the Loan Agreement, on or about November 30, 2007, VNI executed a Commercial Security Agreement granting Aequitas a security interest in collateral (the "Security Agreement"). A true and correct copy of the Security Agreement is attached as Exhibit D and incorporated herein by reference.

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**COMPLAINT**
**Page 2**

9.      On or about November 30, 2007, Aequitas properly perfected its interest in the collateral described in the Security Agreement by filing a financing statement with the Delaware Department of State, U.C.C. Filing Section (the "UCC-1 Perfection Filing").  A true and correct copy of the filing confirmation from Delaware is attached as Exhibit E and incorporated herein by reference.

10.     On or about November 30, 2007, Aequitas also filed notification of its security interest in VNI's patent and patent applications by filing with the United States Patent and Trademark Office.  A true and correct copy of the confirmation receipt for the USPTO filing is attached as Exhibit F and incorporated herein by reference.

11.     Defendant VHI claims an interest in certain of the collateral described in the Security Agreement.  However VHI's interest was acquired after Aequitas perfected its interest in the collateral.

12.     At the time VHI acquired its interest in the collateral it had actual knowledge of Aequitas' security interest.

13.     Under the terms of the Note, VNI was to make monthly interest-only payments each month.

14.     VNI has failed to make the required monthly payments and is currently in arrears.

15.     Under the terms of the Note, all principal and accrued interest were due and payable on January 30, 2008 (the "Maturity Date").

16.     VNI has failed to make the required payments on the Maturity Date and is currently in default.

17.     VNI is in default under the terms set forth in the Note and Security Agreement and pursuant to the terms of the Note and Security Agreement, the entire unpaid balance of the Note is due and payable.

18.     After allowances for all just credits, there remains due and owing to Aequitas

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351

COMPLAINT
Page 3

from VNI the unpaid amount of the principal sum plus interest, costs, and attorneys' fees as provided by the Loan Agreement, the Note, and the Security Agreement.

19.    The interest of VNI and VHI in the collateral is inferior, subordinate and subject to Aequitas' lien.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract as to VNI Only)

20.    Aequitas alleges and incorporates herein the allegations in paragraphs 1 through 19.

21.    VNI is in breach of the Loan Agreement and the Note.

22.    Accordingly, VNI is liable to Aequitas for all amounts unpaid on the Note, plus interest, costs and for attorneys' fees as provided by the Loan Agreement, the Note, and the Security Agreement.

23.    Aequitas is also entitled to conduct a foreclosure sale of the collateral covered by the Security Agreement.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment as to VHI Only)

24.    Aequitas alleges and incorporates herein the allegations in paragraphs 1 through 21.

25.    Aequitas perfected its security interest in the collateral described in the Security Agreement and the UCC-1 Perfection Filing before VHI acquired its interest in the collateral.

26.    On information and belief, VHI disputes that Aequitas' security interest is superior to VHI's security interest.

27.    As a result, there is a real case and controversy.

28.    Accordingly, Aequitas is entitled to a Declaratory Judgment that its security

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**COMPLAINT
Page 4**

interest is superior to VHI's in interest in the collateral.

WHEREFORE, for the reasons set forth above, and for such other reasons as may be presented hereafter, Aequitas prays for:

1. Entry of a judgment against VNI in an amount of all compensatory damages together with interest thereon;

2. Entry of a judgment against VNI for an award of Aequitas' attorney's fees together with costs and Aequitas' costs and disbursements herein;

3. Entry of a judgment declaring that Aequitas' security interest in the collateral is a valid first lien upon the collateral described in the Security Agreement and UCC-1 Perfection Filing;

4. Entry of a judgment that Aequitas' lien be foreclosed and the property covered thereby be sold at foreclosure sale in the manner provided by law, and the proceeds thereof applied on the judgment;

5. Entry of judgment declaring that VHI's interest in the collateral is inferior and subordinate to Aequitas' security interest;

6. An award of prejudgment interest and post-judgment interest as allowed by law; and

7. Other and further relief as the Court deems just and proper.

/// 

/// 

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351

COMPLAINT
Page 5

## DEMAND FOR TRIAL BY JURY

Aequitas hereby makes demand for trial by jury on all claims so triable.

DATED this 20th day of June, 2008.

BULLIVANT HOUSER BAILEY PC

BY _____

**David VanSpeybroeck**
OSB #954440
E-mail: david.vanspeybroeck@bullivant.com
**Dayna J. Christian**
OSB #973360
E-mail: dayna.christian@bullivant.com
Telephone: 503.228.6351
Attorneys for Plaintiff

10622339.2

**Bullivant|Houser|Bailey PC**

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**COMPLAINT**
**Page 6**

# BUSINESS LOAN AGREEMENT

**BORROWER:**  Vivato Networks, Inc.
322 NW Sixth Ave Suite 100
Portland OR 97209

**LENDER:**  Aequitas Capital Management, Inc.
5300 Meadows Road, Suite 400
Lake Oswego, OR 97035
Telephone: (503) 419-3500

1.    **THIS BUSINESS LOAN AGREEMENT** ("Agreement") dated effective November 30, 2007, is made and executed between Vivato Networks, Inc., a Delaware corporation (Delaware Reg. No. 4413500, formerly an Oregon corporation, Oregon Reg. No. 366329-90) ("Borrower"), and Aequitas Capital Management, Inc., an Oregon corporation (Oregon Reg. No. 369086-89) ("Lender"), on the following terms and conditions. Borrower has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loans" and each a "Loan"), in the maximum principal amount of $1,000,000. Borrower understands and agrees that: (a) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (b) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (c) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

2.    **TERMS.** This Agreement shall be effective as of the date of this Agreement, and shall continue in full force and effect until such time as all Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, reasonable attorneys' fees and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement. Borrower shall execute a Promissory Note in the maximum principal amount of $1,000,000 (the "Note"). The Note shall provide for advances and repayments on the Note pursuant to the terms and conditions of this Agreement. The initial Advance (as provided in Section 3 below) to Borrower shall be for $300,000. Subsequent Advances shall be for at least $150,000 and shall be made within 5 days after written request from Borrower and satisfaction of the conditions provided in Section 4.e) below. Contemporaneously with the execution of this Agreement, Borrower shall execute a Security Agreement in favor of Lender wherein, in order to secure the Note in part, Borrower shall grant to Lender a Security Interest in the collateral described therein which consists, among other things, of (i) a first priority lien in all of its assets, including the patents and patent applications listed on Schedule 1 to the Commercial Security Agreement entered into in connection with this Agreement, and (ii) a pledge of the Common Stock of Borrower held by Allan Rakos and Gary Haycox, pursuant to the terms of a Pledge Agreement provide by Lender, and (iii) a pledge of the promissory note evidencing any loan of the proceeds of the Loan by Borrower to Catcher Holdings, Inc. (the "Parent Loan Document"), if applicable. The principal terms of the Loan to be reflected in the Note are as follows:

    a)   **Interest.** Interest shall accrue on the unpaid balance of the Loan at the rate of 20% per annum calculated on the basis of a 365-day or 366-day year, as applicable, and actual days elapsed, payable monthly in arrears to Lender (the "Current Interest").

    b)   **Payments.** Borrower will make monthly interest-only payments on the outstanding balance of the Loan commencing one month after the effective date of this Agreement/date of the Note and continuing on the same day of each month thereafter. At Lender's option, such payments shall be made to Lender via an Automated Clearing House ("ACH") transfer from Borrower's checking account.

    c)   **Maturity.** The outstanding principal balance and all accrued and unpaid interest shall be due and payable on or before January 30, 2008; provided, however, that after the occurrence of an Event of Default, the outstanding principal and all accrued interest shall be payable on demand. In addition, the outstanding principal balance and all accrued and unpaid interest shall be due and payable in the event of (1) a sale of all or substantially all of the assets of Borrower, or (2) the transfer of ownership or beneficial interest, by merger or otherwise, of 25% or more of the stock or membership interests of Borrower, other than the merger of Borrower into Huckleberry Acquisition Corporation (the "Merger") pursuant to the terms of that certain Agreement and Plan of Merger, dated as of September 24, 2007 (as amended, the "Merger Agreement"), by and among the Catcher Holdings, Inc. ("Parent"), Borrower, and Huckleberry Acquisition Corporation, a wholly-owned subsidiary of Parent.

    d)   **Late Charge.** If a payment is 15 days or more late, Borrower will pay to Lender a late charge equal to the lesser of 5.0% of the regularly scheduled payment or the maximum amount permitted under applicable law.

    e)   **Interest After Default.** Upon and during the continuation of an Event of Default, including failure to pay all amounts due upon final maturity of the Loan and Note, Lender may, at its option and if permitted by applicable law, increase the interest rate of the Note by 5.00 percentage points (500 basis points). The interest rate will not exceed the maximum rate permitted by law.

Plaintiff's Complaint
Ex. A
Page 1 of 12

f) **Prepayment.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the Loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. All or any portion of the Loan may be prepaid at any time following notice to Lender of not less than 5 business days. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule; early payments will reduce the outstanding principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such payment, Lender may accept it without losing any of Lender's rights under the Loan, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of any disputed amount must be mailed or delivered to Lender at the address above.

3.    **FUNDING.** Upon the initial satisfaction of conditions provided in Section 4 below, Lender shall make an initial Advance of $70,000 and an additional Advance of $230,000 within three (3) business days thereafter. Further Advances shall be made as provided in Section 4, including the Advance-specific conditions of Section 4.e) below.

4.    **CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligations to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment of Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents, specifically including:

a) **Loan Documents.** Borrower shall execute and deliver or otherwise provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) pledge agreements from Allan Rakos and Gary Haycox covering their 60% of the outstanding stock of the Borrower prior to the Merger; (6) a pledge agreement from Parent with regard to 100% of the capital stock of Borrower, effective as of the completion of the Merger; and (7) all such additional Related Documents as Lender may require for the Loan. All such documents shall be in form and substance satisfactory to Lender and Lender's counsel.

b) **Authorizations.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel may require.

c) **Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges and other expenses which are incurred by Lender in connection with the Loan, or as specified in this Agreement or any Related Document, including without limitation reasonable attorney fees (including fees of in-house counsel), collateral appraisal costs, travel costs, lien search fees and filing fees, together with a fully-earned, non-refundable loan fee for this credit facility in the sum of $10,000. Lender acknowledges prior receipt of the sum of $10,000 to be applied in payment of these fees and expenses. Lender may elect to withhold such fees and reimbursable expenses from any Advance. If any such fees or expenses have not been finally determined at the time of an Advance, Lender may withhold an estimated amount from the Advance with reconciliation to occur when the actual amounts have been finally determined. If any amount withheld is insufficient to pay such fees or expenses, Borrower shall promptly reimburse Lender upon request or invoice for the same.

d) **Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

e) **Specific Conditions.** After the first Advance of $300,000, the following conditions shall apply:

    i.   The Merger (as defined in Section 2.c) above) shall have taken place.

    ii.  For an additional Advance of $150,000 on or after December 15, 2007, Parent shall have entered into a formal mandate with an investment banking firm, which firm is reasonably acceptable to Lender, for a preferred stock offering of at least $5,000,000 (the "Parent Preferred Offering") and the Parent shall have arranged sufficient financing, to the sole satisfaction of Lender, to repay any notes due under the Parent's Note and Restricted Stock Purchase Agreement that mature on or before January 30, 2008 unless such note holders have delivered irrevocable written notice under the Note and Restricted Stock Purchase to convert such notes to stock of Parent.

    iii. For an additional Advance of $300,000 on or after January 3, 2008, Parent shall have caused the preparation of a formal offering memorandum for the Parent Preferred Offering and have made significant progress, in the sole opinion of Lender, towards completing and funding the Parent Preferred Offering by January 31, 2008.

Plaintiff's Complaint
Ex. A
Page 2 of 12

iv. For a final Advance of $250,000, Lender shall, at its sole discretion of Lender based on the operating needs and the performance of Parent and Borrower, have determined that such Advance is advisable.

f) **No Event of Default.** There shall not exist at the time of any Advance a condition which, with the passage of time or otherwise, would constitute an Event of Default under this Agreement or under any Related Document.

g) **Consents; Intercreditor Agreements.** Borrower shall have obtained any necessary consents and approvals from other lenders or third parties in order to consummate the transactions contemplated by this Agreement or any Related Document. If deemed appropriate by Lender, an intercreditor agreement and lien releases satisfactory to Lender shall have been executed by other lenders to ensure the priority of Lender's Security Interests.

h) **Key Man Life Insurance.** Lender shall have been designated as the assignee/beneficiary (as its interest may appear) of key man life insurance as described in Section 6.g) below.

i) **Pledge of Parent Loan Document.** Borrower shall have delivered the originals of the Parent Loan Document in order to perfect the grant of the security interest of Lender therein.

j) **Employment Agreements.** Borrower shall have entered into employment agreements with key management employees designated by Lender on terms satisfactory to Lender no later than December 15, 2007.

k) **Advisory Services Agreement.** An advisory services agreement shall be in effect between Borrower and Aequitas Capital Management, Inc. (the "Advisory Services Agreement"), and Borrower shall not be in default of its obligations under such agreement.

5.    **REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of Loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

a) **Organization.** Borrower is, and at all times shall be, duly organized, validly existing and in good standing under and by virtue of the laws of the state of its incorporation or formation. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified to do business in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains its principal office at the address set forth on the first page of this Agreement, and any other office or warehouse locations are listed in the **Disclosure Schedule** attached to this Agreement. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender at least thirty (30) days prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

b) **Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, a complete list of all assumed business names under which Borrower does business is listed in the attached **Disclosure Schedule**.

c) **Authorization.** Borrower's execution, delivery and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of Borrower's articles of organization, operating agreement, articles of incorporation, bylaws, other organizational documents or agreements or instruments binding upon Borrower or (2) any law, governmental regulation, court decree or order applicable to Borrower or to Borrower's properties.

d) **Capitalization.** The authorized capital stock of Borrower consists of 20,000,000 shares of common stock and, as of the date hereof, 3,500,000 shares are issued and outstanding ("Borrower's Stock"). There are no outstanding subscriptions, options, warrants, preemptive or other preferential rights, or other arrangements under which the Borrower is or may be obligated to issue any securities. Allan Rakos owns 20.68 % of Borrower's Stock, consisting of 723,799.79 common shares, Gary Haycox owns 42.43 % of Borrower's Stock, consisting of 1,485,049.60 common shares, and other shareholders own the remaining 36.89 % of Borrower's Stock. No other capital stock of Borrower is authorized or issued and there are no outstanding warrants, options or other rights to acquire stock of Borrower.

e) **Financial Information.** Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in

Plaintiff's Complaint
Ex. A
Page 3 of 12

Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

f) **Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable and liens listed in the attached **Disclosure Schedule**, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years, except as disclosed in the attached **Disclosure Schedule**.

g) **Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of Borrower's Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral, except to the extent any such activity is permitted under applicable Environmental Laws and conducted in compliance with all applicable federal, state and local laws, regulations and ordinances including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon any area in which the Collateral is stored in order to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance in, on or related to the Collateral, or as a result of a violation of any Environmental Laws. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

h) **Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or, to the knowledge of Borrower, threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims or other events, if any, that have been disclosed to Lender in the **Disclosure Schedule**.

i) **Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently owing or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

j) **Lien Priority.** Except as disclosed to Lender in the **Disclosure Schedule**, Borrower has not entered into or granted any security agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

k) **Merger Agreement.** Notwithstanding anything to the contrary herein, Lender acknowledges and approves the merger of Borrower into Huckleberry Acquisition Corporation (the "Merger") pursuant to the terms of that certain Agreement and Plan of Merger, dated as of September 24, 2007, as amended (the "Merger Agreement"), by and among the Catcher Holdings, Inc. ("Parent"), Borrower, and Huckleberry Acquisition Corporation, a wholly-owned subsidiary of Parent, including but not limited to the transfer of the Intellectual Property of Borrower as referenced in the Merger Agreement (terms defined above), subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of the Security Agreement entered into in connection with this Agreement.

l) **Binding Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally

Plaintiff's Complaint
Ex. A
Page 4 of 12

6. **AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

a) **Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower which could materially affect the financial condition of Borrower.

b) **Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

c) **Financial Statements.** Furnish Lender with the following:

    i. **Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each fiscal year, Borrower's balance sheet and income statements for the year ended, audited/reviewed/compiled by a certified public accountant satisfactory to Lender provided, however, that following the Merger, the Borrower shall instead deliver the Annual Report on Form 10-KSB of Catcher Holdings, Inc. as filed with the Securities and Exchange Commission, within two (2) days of such filing.

    ii. **Interim Statements.** As soon as available, but in no event later than forty-five (45) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender; provided, however, that following the Merger, the Borrower shall instead deliver the Quarterly Report on Form 10-QSB of Catcher Holdings, Inc. as filed with the Securities and Exchange Commission, within two (2) days of such filing.

    iii. **Additional Requirements.** Copies of tax returns within fifteen (15) days of filing.

d) **GAAP.** Prepare all financial reports required to be provided under this Agreement according to GAAP and certify the same as being true and correct.

e) **Additional Information.** Furnish such additional information and statements, including confirmation of paid obligations (e.g., tax obligations), as Lender may request from time to time.

f) **Insurance.** Maintain fire and other risk insurance, public liability insurance and such other insurance as Lender may require with respect to Borrower's properties and operations, including insurance covering all inventory and Collateral covered by any Security Agreement from Borrower in favor of Lender, in such form, amounts, coverages and with insurance companies acceptable to Lender, no later than December 7, 2007. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a Security Interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

g) **Key Man Life Insurance.** Obtain, by December 30, 2007, and maintain at all times while the Loan is outstanding a life insurance policy or policies on the lives of Allan Rakos and Gary Haycox, or other key management employees designated by Lender, each with a death benefit sufficient to satisfy the Loan obligations in full.

h) **Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

i) **Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations or such purpose(s) as may be specifically set forth in this Agreement, unless specifically consented to the contrary by Lender in writing.

j) **Employment Agreements.** Enter into employment agreements with employees of Borrower designated by Lender on terms satisfactory to Lender by December 15, 2007.

k) **Corporate Governance.** (1) Convene meetings of Borrower's Board of Directors not less than once each calendar quarter, (2) allow Lender's designated representative(s) to have observation rights with respect to meetings of the Board of Directors (in person or by telephone), (3) send notice to Lender of the time and place of any meetings of the Board of Directors in the same manner and at the same time as notice is sent to members of the Board of Directors, (4) upon request of Lender, cause Borrower's shareholders to promptly elect to the Board of Directors up to 2 persons designated by Lender, and (5) pay the reasonable out-of-pocket costs and expenses incurred by Lender's designated observers or directors (not exceeding 2 persons) in connection with attending regular and

Plaintiff's Complaint
Ex. A
Page 5 of 12

special meetings of the Board of Directors or any committee thereof, together with (in the case of directors only) any additional compensation payable to directors pursuant to policies adopted by Borrower or its Board of Directors.

l)   **Advisory Engagement.** Continue to utilize the advisory services of Aequitas Capital Management, Inc. pursuant to the terms of the Advisory Service Agreement, as the same may be modified by mutual agreement of the parties thereto.

m)   **Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income or profits.

n)   **Performance.** Perform and comply in a timely manner with all terms, conditions and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

o)   **Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; and conduct its business affairs in a reasonable and prudent manner.

p)   **Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance, defined as toxic or a hazardous substance under applicable federal, state or local law, rule, regulations, order or directive, on or affecting any property or any facility owned, leased or used by Borrower.

q)   **Compliance with Governmental Requirements.** Comply with all laws, ordinances and regulations, now or hereafter in effect, of all governmental authorities, applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

r)   **Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts and records and to make copies and memoranda of Borrower's books, accounts and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense. Any expense incident to the exercise by Lender of any right under this section for one annual inspection or audit and any inspections or audits following the occurrence of an uncured Event of Default shall be borne by Borrower, otherwise such expense shall be borne by Lender.

s)   **Environmental Compliance and Reports.** Comply in all respects with any and all Environmental Laws and furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

t)   **Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, landlord waivers, instruments, documents and other agreements as Lender or its counsel may reasonably request to evidence and secure the Loans and to perfect all Security Interests. Borrower shall promptly reimburse Lender upon request or invoice for all fees, charges and other expenses which are subsequently incurred by Lender in connection with the Loan, including without limitation reasonable attorney fees (including fees of in-house counsel), collateral appraisal and inspection costs, travel costs, lien search fees and filing fees.

7.    **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring,

Plaintiff's Complaint
Ex. A
Page 6 of 12

maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the day of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (a) be payable on demand; or (b) be treated as a balloon payment which will be due and payable at the Note's maturity.

8.    **NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

a)    **Liens.** (1) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (2) sell any of Borrower's accounts, except to Lender and except as contemplated by the Merger.

b)    **Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, amend its organizational documents (including a change of its name) or dissolve, except as contemplated by the Merger, (3) transfer or sell Collateral, except for sales of inventory in the ordinary course of business, and except as contemplated by the Merger, including but not limited to the transfer of the Intellectual Property to Vivato Networks Holdings, Inc., subject, however, to the first priority lien of Lender in such Intellectual Property pursuant to the terms of the Security Agreement entered into in connection with this Agreement, (4) make any distribution to shareholders or members or with respect to any capital account, whether by reduction of capital or otherwise, except a distribution to pay taxes attributable to pass-through taxable income from Borrower, (5) redeem or repurchase any of Borrower's outstanding capital stock or membership interests or any option to acquire Borrower's capital stock or membership interests, or (6) issue any additional capital stock or membership interest or any option to acquire capital stock or membership interests, except as contemplated by the Merger.

c)    **Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligations as surety or guarantor other than in the ordinary course of business.

9.    **CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (a) an Event of Default occurs and is continuing under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower has with Lender; (b) Borrower files a petition in bankruptcy or similar proceedings, or is adjudged as bankrupt; (c) there occurs a material adverse change in Borrower's financial condition or in the value of any Collateral securing any Loan; or (d) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

10.    **DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement.

a)    **Payment Default.** Borrower fails to make any payment within five (5) calendar days when due under the Note.

b)    **Other Defaults.** Borrower or any Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in the Note or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender (or an affiliate of Lender) and Borrower. If any failure, other than a failure to pay money, is curable and if Borrower or a Grantor, as the case may be, has not been given a notice of a similar breach within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or a Grantor, as the case may be, after delivery of written notice from Lender demanding cure of such failure: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than 15 days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance within sixty (60) days after notice is sent.

c)    **Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit or security agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Note or perform Borrower's obligations under the Note or any of the Related Documents.

d)    **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement, the Note or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading in any material respect at any time thereafter.

e)    **Bankruptcy.** The dissolution of Borrower (regardless of whether election to continue is made), or any other termination of Borrower's existence as a going business, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Plaintiff's Complaint
Ex. A
Page 7 of 12

f) **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.

g) **Adverse Change.** A material adverse change occurs in Borrower's financial condition.

11.    **EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur and be continuing, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Bankruptcy" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform any obligation of Borrower or of any Grantor shall not affect Lender's right to declare an Event of Default and to exercise its rights and remedies.

12.    **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

a) **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

b) **Loan Expenses.** From time to time following the initial Advance, Borrower will pay all reasonable expenses of Lender on demand (including, without limitation, search costs, audit fees, appraisal fees and the fees and expenses of outside and in-house legal counsel for Lender) relating to this Agreement, and all Related Documents, including, without limitation, expenses incurred in the analysis, negotiation, preparation, closing, administration and enforcement of this Agreement and the Related Documents, the enforcement, protection and defense of the rights of Lender in and to the Loans and Collateral or otherwise hereunder, and any reasonable expenses relating to extensions, amendments, waivers or consents pursuant to the provisions hereof, or any Related Documents or relating to agreements with other creditors, or termination of this Agreement (collectively, the "Expenses").

c) **Legal and Collection Expenses.** Lender may hire or pay someone else to help collect the Indebtedness if Borrower does not pay. Borrower will pay Lender that amount in addition to the Expenses. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and legal expenses, whether or not there is a lawsuit, including without limitation attorneys' fees and expenses incurred by Lender at trial, on appeal, and in any arbitration or bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction). If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

d) **Marketing Authorization.** Borrower agrees that Lender or its affiliates may use Borrower's name and logo, and general information concerning Borrower's relationship with Lender and its affiliates, on the website and in firm brochures maintained and created by Lender or its affiliates (typically in a form commonly known as "tombstones"), in press releases, advertisements, and in other related marketing materials. This authorization will extend to reissues of the advertisements and other marketing tools which Lender or its affiliates may utilize in marketing activities. Borrower may notify Lender in writing at any time to stop further use of references to Borrower in marketing materials.

e) **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

f) **Assignments.** Borrower acknowledges that Lender may (i) sell and assign its interest in this Agreement, the Note, the payments due thereunder and the Related Documents, in whole or in part, or sell participations therein, to an assignee (the "Assignee") which may be represented by a bank or trust company acting as a trustee of such Assignee. BORROWER ACKNOWLEDGES THAT ANY ASSIGNMENT OR TRANSFER BY LENDER OR ANY ASSIGNEE SHALL NOT MATERIALLY CHANGE BORROWER'S OBLIGATIONS UNDER THE ASSIGNED NOTE AND RELATED DOCUMENTS. Any Assignee shall be entitled to enforce all the rights so assigned but be under no obligation to Borrower to perform any of Lender's obligations under the assigned Note and any Related Documents, the sole remedy of Borrower being against Lender with Borrower's right against Lender being unaffected except as provided herein. Borrower agrees that upon notice of assignment of the Note and any Related Documents, it shall pay directly to the Assignee, unconditionally, all amounts which become due thereunder. Borrower specifically covenants and agrees that it will not assert against any Assignee any claims by way of abatement, defense, set-off, counterclaim, recoupment or otherwise which Borrower may have against Lender or any third party, and BORROWER SHALL NOT ASSERT AGAINST SUCH ASSIGNEE IN ANY ACTION FOR NOTE PAYMENTS OR OTHER MONEYS PAYABLE THEREUNDER ANY DEFENSE EXCEPT THE DEFENSE OF PAYMENT TO SUCH

Plaintiff's Complaint
Ex. A
Page 8 of 12

ASSIGNEE. Upon Lender's request, Borrower will acknowledge to any assignee receipt of Lender's notice of assignment.

g) **Governing Law; Choice of Venue.** This Agreement will be governed by, construed and enforced in accordance with the laws of the State of Oregon. This Agreement has been accepted by Lender in the State of Oregon. If there is a lawsuit, Borrower agrees to submit to the jurisdiction of the courts of Multnomah County, Oregon, or the U.S. District Court for the District of Oregon, as applicable.

h) **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

i) **Notices.** Any notice required to be given under the Agreement shall be given in writing, and shall be effective when actually delivered, when deposited with a reputable overnight courier for next business day delivery, or if mailed, when deposited in the United States mail as first class, certified or registered mail with postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving written notice to the other parties, specifying that the purpose of the notice is to change the party's address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

j) **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

k) **Subsidiaries and Affiliates of Borrower.** To the extent the context of any provision of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

l) **Successors and Assigns.** All covenants and agreements contained herein by or on behalf of Borrower shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein without the prior written consent of Lender.

m) **Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

n) **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

o) **Jury Waiver. ALL PARTIES TO THIS AGREEMENT HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY.**

13. **DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this

Plaintiff's Complaint
Ex. A
Page 9 of 12

Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

a) **Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a multiple advance basis under the terms of this Agreement.

b) **Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to the Business Loan Agreement from time to time.

c) **Borrower.** The word "Borrower" means the person named as Borrower on the first page of this Agreement and all other persons and entities signing the Note in whatever capacity.

d) **Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien and title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract or otherwise.

e) **Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1808, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules or regulations adopted pursuant thereto or intended to protect human health or the environment.

f) **Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

g) **GAAP.** The word "GAAP" means United States generally accepted accounting principles, consistently applied.

h) **Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

i) **Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quality, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

j) **Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

k) **Loans.** The word "Loans" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

l) **Note.** The word "Note" means each promissory note executed and delivered by Borrower to Lender, including without limitation, the Promissory Note executed by Borrower in the maximum principal amount of $1,000,000 of even date herewith, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for each note or credit agreement.

m) **Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness"; (5) liens and security interests which, as of the date of this Agreement, have

Plaintiff's Complaint
Ex. A
Page 10 of 12

been disclosed to and approved by Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the value of Borrower's assets.

n) **Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, stock pledge agreements, mortgages, deeds of trust, security deeds, collateral mortgages, landlord waivers and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loans.

o) **Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract or otherwise, evidencing, governing, representing or creating a Security Interest.

p) **Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract or otherwise.

**UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY LENDER AFTER OCTOBER 3, 1989 CONCERNING LOANS AND OTHER CREDIT EXTENSIONS MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY LENDER TO BE ENFORCEABLE.**

**BORROWER ACKNOWLEGES HAVING READ ALL OF THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS.**

BORROWER:

VIVATO NETWORKS, INC.

By: _____
Name: _____GARY HAYCOX_____
Title _____CEO_____

LENDER:

AEQUITAS CAPITAL MANAGEMENT, INC.

By: _____
Authorized Signature

AUTHORIZED AND APPROVED:

CATCHER HOLDINGS, INC.

By: _____
Name: _____DENNIS McCARTHY_____
Title: _____CFO_____

CATCHER, INC.

By: _____
Name: _____DENNIS McCARTHY_____
Title: _____CFO_____

Plaintiff's Complaint
Ex. A
Page 11 of 12

## DISCLOSURE SCHEDULE TO BUSINESS LOAN AGREEMENT

1. The correct corporate (or other entity) name of Borrower is _____ Vivato Networks, Inc. .

2. Borrower is organized and existing under the laws of the following State: _____ Delaware

3. Borrower has operated under only the following other names and trade names (if none, so state):
VIVATO NETWORKS, INC., VIVATO NETWORKS, LLC, and WAYOUT WIRELESS, LLC

4. All other addresses at which Borrower does business are listed below, including all warehouse addresses:
_____ Devries Storage, 3808 N. Sullivan Road, Blding #22, Spokane
_____ Valley, WA 99216

5. Borrower has deposit accounts and/or investment accounts located only at the following institutions:

| Institution Name | Account Number |
| --- | --- |
| Bank of Oswego | 13001912 |
| | |
| | |
| | |
| | |

6. There is no litigation, claim, investigation, administrative proceeding or similar action pending or threatened against Borrower, except the following (attach additional comments, if needed): _____ None.

7. Federal Tax ID Number: _____ 20-4522882

8. Organizational Number, if any: DE Reg. No. 4413500 (formerly Oregon Reg. No. 366329-90)

9. There are no security agreements or security interests affecting Borrower's properties except the following:
_____ None, except as express or implied pursuant to the Merger
Agreement, including but not limited to a transfer of the
Intellectual Property to Vivato Networks Holdings, Inc., subject,
however, to the first priority lien of Lender in the Collateral
pursuant to the terms of the Security Agreement entered into in
connection with this Agreement

Plaintiff's Complaint
Ex. A
Page 12 of 12

## LOAN ASSIGNMENT AND ACCEPTANCE
### (Vivato Networks, Inc.)

Reference is made to that certain Business Loan Agreement dated as of November 30, 2007 (as amended and in effect on the date hereof, the "Loan Agreement"), between Aequitas Capital Management, Inc., an Oregon corporation (Oregon Reg. No. 369086-89), the Lender named therein, and Vivato Networks, Inc., a Delaware corporation (Delaware Reg. No. 4413500, formerly an Oregon corporation, Oregon Reg. No. 366329-90), the Borrower named therein. Terms defined in the Loan Agreement are used herein with the same meanings.

AEQUITAS CAPITAL MANAGEMENT, INC., an Oregon corporation (Oregon Reg. No. 369086-89) (the "Assignor") hereby sells and assigns, without recourse, for good and valuable consideration, the receipt of which is hereby acknowledged, to AEQUITAS EQUIPMENT FINANCE, LLC, an Oregon limited liability company (Oregon Reg. No. 432018-96) (the "Assignee"), and the Assignee hereby purchases and assumes, without recourse, from the Assignor, effective as of the Assignment Date set forth below, all right, title and interest of the Lender in and to the Loans and all rights under the Loan Agreement and the Related Documents (including, without limitation, the Commercial Security Agreement and Stock Pledge Agreements executed in connection with the Loan Agreement, and all rights to the Security Interests in the Collateral) (the "Assigned Interest") including the Loans owing to the Assignor which are outstanding on the Assignment Date, together with unpaid interest accrued on the assigned Loans to the Assignment Date, and the all fees accrued to the Assignment Date for account of the Assignor. The Assignee hereby acknowledges receipt of a copy of the Loan Agreement and the Related Documents. From and after the Assignment Date (i) the Assignee shall be a party to and be bound by the provisions of the Loan Agreement and, to the extent of the interests assigned by this Assignment and Acceptance, have the rights and obligations of the Lender thereunder, and (ii) the Assignor shall relinquish its rights and be released from its obligations under the Loan Agreement and the Related Documents.

This Loan Assignment and Acceptance shall be governed by and construed in accordance with the laws of the State of Oregon.

Date of Assignment:  November 30, 2007

AEQUITAS CAPITAL MANAGEMENT, INC.        AEQUITAS EQUIPMENT FINANCE, LLC

By: _____            By: _____
    Authorized Signature                     Authorized Signature

Acknowledged and approved:

VIVATO NETWORKS, INC.

By: _____
    Title: _CEO_____

CATCHER HOLDINGS, INC.

By: _____
    Title: _EVP & CTO_____

Plaintiff's Complaint
Ex. B
Page 1 of 1

# PROMISSORY NOTE

| BORROWER: | Vivato Networks, Inc.<br>322 NW Sixth Ave Suite 100<br>Portland OR 97209 | LENDER: | Aequitas Capital Management, Inc.<br>5300 Meadows Road, Suite 400<br>Lake Oswego, OR 97035<br>Telephone: (503) 419-3500 |
|---|---|---|---|

**Maximum Principal Amount: $1,000,000    Initial Interest Rate: 20%    Date of Note: November 30, 2007**

1.  **PROMISE TO PAY.** The Borrower hereby promises to pay to the order of Lender on or before the Maturity Date, at Lender's principal place of business, or at such other place as Lender may direct, the principal sum of One Million Dollars ($1,000,000.00) or so much thereof as may be advanced and outstanding, together with all interest accrued on unpaid principal, to be computed on each Advance from the date of its disbursement to Borrower, at a rate as provided in Section 5 below, as provided in the Loan Agreement (as defined in Section 3 below). The outstanding principal amount of this Note, together with accrued interest thereon, shall be due and payable in full on the Maturity Date. The outstanding unpaid principal balance of this Note at any time shall be the total principal amounts advanced hereunder by Lender less the amounts of payments of principal made hereon by Borrower, which balance may be endorsed hereon from time to time by Lender in accordance with Section 2.

2.  **RECORDING ADVANCES.** Lender is authorized to record on **Schedule A – Loan Advances** hereto, and on any continuation(s) of such Schedule that may be attached to this Note: (a) the date and principal amount of each Advance by Lender under the Loan Agreement; which recordation will constitute prima facie evidence of the accuracy of the information so endorsed on **Schedule A – Loan Advances**; provided however, that any failure to record such information on such Schedule or continuation thereof will not in any manner affect the obligations of Borrower to make payments of principal and interest in accordance with the terms of this Note. Lender will promptly provide Borrower with a copy of each recordation made by Lender on **Schedule A – Loan Advances** attached hereto.

3.  **PURPOSE.** This Note is issued pursuant to that certain Business Loan Agreement between Borrower and Lender of even date herewith (the "Loan Agreement") and is subject to all of the terms thereof. Capitalized terms used herein which are not otherwise defined, if any, shall have the meanings ascribed to them in the Loan Agreement.

4.  **ADVANCES; RESTRICTIONS.** The outstanding balance of Advances made under this Note may fluctuate from time to time, to be increased by future Advances which may be made by Lender and to be decreased by repayments made by Borrower. Borrower acknowledges and agrees that Lender is under no obligation to make any Advance hereunder and any Advance shall be in Lender's sole and absolute discretion pursuant to the terms of the Loan Agreement.

5.  **INTEREST RATE AND PAYMENT.** Interest shall accrue on the unpaid balance of this Note at the rate of 20% per annum on the unpaid principal balance and shall be calculated on the basis of a 365-day or 366-day year and actual days elapsed. **NOTICE:** Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

6.  **PAYMENT.** Borrower will pay this Note as follows: Borrower will make monthly interest-only payments on the outstanding balance of the Note commencing one month after the date of the Note and continuing on the same day of each month thereafter. At Lender's option, such payments shall be made to Lender via an Automated Clearing House ("ACH") transfer from Borrower's checking account.

7.  **MATURITY; APPLICATION OF PAYMENTS.** The outstanding principal balance and all accrued and unpaid interest shall be due and payable on or before January 30, 2008 (the "Maturity Date"), provided, however, that after the occurrence of an Event of Default, the outstanding principal and all accrued interest shall be payable on demand. Unless otherwise agreed or required by applicable law, payments will be applied first to expenses for which Borrower is liable hereunder (including unpaid collection costs and late charges), next to accrued and unpaid interest, and the balance to principal. In addition, the outstanding principal balance and all accrued and unpaid interest shall be due and payable in the event of (1) a sale of all or substantially all of the assets of Borrower, or (2) the transfer of ownership or beneficial interest, by merger or otherwise, of 25% or more of the stock or membership interests of Borrower, other than transfers between or among the shareholders of Borrower in existence as of the date of this Agreement and other than the merger of Borrower

Plaintiff's Complaint
Ex. C
Page 1 of 5

into Huckleberry Acquisition Corporation pursuant to the terms of that certain Agreement and Plan of Merger, dated as of September 24, 2007 (the "Merger Agreement"), by and among the Catcher Holdings, Inc., Borrower, and Huckleberry Acquisition Corporation, a wholly-owned subsidiary of Catcher Holdings, Inc. It is understood and acknowledged by Lender that Borrower shall be transferring certain of the Intellectual Property of Borrower to Vivato Networks Holdings, Inc. after execution of this Agreement and prior to closing of the Merger referenced herein, as set forth in more detail in the Merger Agreement, but subject to the first priority lien of the Security Interest in favor of the Lender pursuant to the terms of the Security Agreement entered into in connection with this Note and the Loan Agreement.

8.   **FEES AND CHARGES.**  Borrower agrees that all loan fees and prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.   Except for the foregoing, all or any portion of this Note may be prepaid at any time.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligations to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of any disputed amount must be mailed or delivered to Lender at the address above.

9.   **LATE CHARGE.**  If a payment is 15 days or more late, Borrower will pay to Lender a late charge equal to the lesser of 5.0% of the regularly scheduled payment or the maximum amount permitted under applicable law.

10.  **INTEREST AFTER DEFAULT.**  Upon the occurrence of and during the continuation of an Event of Default, including failure to pay all amounts due upon final maturity of this Note, Lender may, at its option and if permitted by applicable law, increase the interest rate of this Note by 5.00 percentage points (500 basis points). The interest rate will not exceed the maximum rate permitted by law.

11.  **DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

> a.   **Payment Default.**  Borrower fails to make any payment within five (5) calendar days when due under this Note.

> b.   **Other Defaults.**  Borrower or any Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender (or an affiliate of Lender) and Borrower.  If any failure, other than a failure to pay money, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar breach within the preceding 12 months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, as the case may be, after delivery of written notice from Lender demanding cure of such failure: (a) cures the failure within 15 days; or (b) if the cure requires more than 15 days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance within 60 days after notice is sent.

> c.   **Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sale agreement, or any other agreement in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the Related Documents.

> d.   **False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading in any material respect at any time thereafter.

> e.   **Bankruptcy.**  The dissolution of Borrower (regardless of whether election to continue is made), or any other termination of Borrower's existence as a going business, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Plaintiff's Complaint
Ex. C
Page 2 of 5

f.  **Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any Collateral securing the Loan.

g.  **Adverse Change.**  A material adverse change occurs in a Borrower's financial condition.

**12. LENDER RIGHTS.**  Upon the occurrence of an Event of Default, Lender may declare the entire unpaid principal balance of this Note and all unpaid interest and other amounts outstanding, including any prepayment charge which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower, and Borrower will pay that amount.  In the case of an Event of Default of the type described in the "Bankruptcy" subsection above, such acceleration shall be automatic and not optional.

**13. ATTORNEYS' FEES; EXPENSES.**  Lender may hire or pay someone else to help collect this Note if Borrower does not pay.  Borrower will pay Lender that amount.  This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and legal expenses, whether or not there is a lawsuit, including without limitation attorneys' fees and expenses incurred by Lender at trial, on appeal and in any arbitration or bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction).  If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**14. ASSIGNMENTS.**  Borrower acknowledges that Lender may sell and assign its interest in this Note, the payments due thereunder and all Related Documents, and all participations therein, to an assignee (the "Assignee") which may be represented by a bank or trust company acting as a trustee of such Assignee.  BORROWER ACKNOWLEDGES THAT ANY ASSIGNMENT OR TRANSFER BY LENDER OR ANY ASSIGNEE SHALL NOT MATERIALLY CHANGE BORROWER'S OBLIGATIONS UNDER THE ASSIGNED NOTE.  Any Assignee shall be entitled to enforce all the rights so assigned but be under no obligation to Borrower to perform any of Lender's obligations under the assigned Note, the sole remedy of Borrower being against Lender with Borrower's right against Lender being unaffected except as provided herein.  Borrower agrees that upon notice of assignment of this Note, it shall pay directly to the Assignee, unconditionally, all amounts which become due hereunder.  Borrower specifically covenants and agrees that it will not assert against any Assignee any claims by way of abatement, defense, set-off, counterclaim, recoupment or otherwise which Borrower may have against Lender or any third party, and BORROWER SHALL NOT ASSERT AGAINST SUCH ASSIGNEE IN ANY ACTION FOR NOTE PAYMENTS OR OTHER MONEYS PAYABLE HEREUNDER ANY DEFENSE EXCEPT THE DEFENSE OF PAYMENT TO SUCH ASSIGNEE.  Upon Lender's request, Borrower will acknowledge to any Assignee receipt of Lender's notice of assignment.  Lender acknowledges the Merger Agreement referenced above, and authorizes and approves any and all assignments associated therewith, subject to the first priority lien of Lender in the Collateral pursuant to the terms of the Security Agreement entered into in connection with this Note and the Loan Agreement.

**15. JURY WAIVER.   LENDER AND BORROWER HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER LENDER OR BORROWER AGAINST THE OTHER.**

**16. GOVERNING LAW.**  This Note will be governed by, construed and enforced in accordance with the laws of the State of Oregon.  This Note has been accepted by Lender in the State of Oregon.

**17. CHOICE OF VENUE.**  If there is a lawsuit, Borrower agrees to submit to the jurisdiction of the courts of Multnomah County, State of Oregon, or the U.S. District Court of the District of Oregon, as applicable.

**18. COLLATERAL.**  Borrower acknowledges this Note is secured by the Collateral described in the Loan Agreement and/or Security Agreements executed by Borrower and/or Grantor.

**19. LOAN AGREEMENT AND SECURITY AGREEMENTS.**  This Note incorporates by reference all the provisions of the Loan Agreement and the Security Agreements entered into in connection herewith, including but not limited to all provisions contained therein with respect to Events of Default, waivers, remedies and covenants, and the description of the benefits, rights and obligations of each of Borrower and Lender under the Loan Agreement and the Security Agreements.

**20. SUCCESSOR INTERESTS.**  The terms of this Note shall be binding upon Borrower and Borrower's successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

Plaintiff's Complaint
Ex. C
Page 3 of 5

21. **GENERAL PROVISIONS.** Lender may delay or forego enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the Collateral and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. If there is more than one Borrower, the obligations of each Borrower under this Note are joint and several.

UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY LENDER AFTER OCTOBER 3, 1989 CONCERNING LOANS AND OTHER CREDIT EXTENSIONS MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY LENDER TO BE ENFORCEABLE.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THIS NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETE COPY OF THIS NOTE.

BORROWER:

VIVATO NETWORKS, INC.

By: _____
Name: GARY HAYCOX
Title: CEO

AUTHORIZED AND APPROVED:

CATCHER HOLDINGS, INC.

By: _____
Name: DENIS M. CARTHY
Title: CEO

CATCHER, INC.

By: _____
Name: DENIS M. CARTHY
Title: CEO

Page 4 of 5 – PROMISSORY NOTE

Plaintiff's Complaint
Ex. C
Page 4 of 5

## Schedule A – Loan Advances

Advances of Principal

| Date | Amount of Advance | Notation Made By |
|------|-------------------|------------------|
|      |                   |                  |
|      |                   |                  |
|      |                   |                  |
|      |                   |                  |
|      |                   |                  |
|      |                   |                  |
|      |                   |                  |
|      |                   |                  |
|      |                   |                  |
|      |                   |                  |

Plaintiff's Complaint
Ex. C
Page 5 of 5

# COMMERCIAL SECURITY AGREEMENT

| | |
|---|---|
| **BORROWER/ GRANTOR:** Vivato Networks, Inc., formerly Vivato Networks, LLC 322 NW Sixth Ave Suite 100 Portland OR 97209 | **LENDER:** Aequitas Capital Management, Inc. 5300 Meadows Road, Suite 400 Lake Oswego, OR 97035 Telephone: (503) 419-3500 |

**THIS COMMERCIAL SECURITY AGREEMENT** dated November 30, 2007, is made and executed between Vivato Networks, Inc., a Delaware corporation (Delaware Reg. No. 4413500, formerly an Oregon corporation, Oregon Reg. No. 366329-90) ("Borrower"), and Aequitas Capital Management, Inc., an Oregon corporation (Oregon Reg. No. 369086-89) ("Lender").

1.    **GRANT OF SECURITY INTEREST.** For valuable consideration, Borrower grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to Collateral, in addition to all other rights which Lender may have by law.

2.    **COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Borrower is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note, this Agreement, and the Related Documents.

> All cash, accounts receivable, notes receivable, contract rights, deposits, securities, investments, chattel paper, documents, instruments (including without limitation the promissory note evidencing the loan of the proceeds of the Loan by Borrower to Catcher Holdings, Inc. (the "Parent Loan Document"), patents, patent applications, trade secrets, trademarks, Tradenames, copyrights, general intangibles, inventory, raw materials, work in progress, finished goods, furnishings, fixtures, trade fixtures, equipment, machinery, motor vehicles and all other personal property, assets or rights of whatever nature now owned or hereafter acquired by Borrower and products and proceeds thereof, including all Goods, all Accounts, all General Intangibles, all Deposit Accounts, all Equipment, all Inventory, all Intellectual Property, all books and records pertaining to the Collateral, Chattel Paper, Instruments, Investment Property, Letter-of-Credit Rights. Documents, and to the extent not otherwise included, all Proceeds, Supporting Obligations and products pertaining to any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing, as such terms are defined in Section 11 below.

> In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located.

> a)    All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

> b)    All products and produce of any of the property described in this Collateral section.

> c)    All accounts, general intangibles, instruments, rents, monies, payments and all other rights, arising out of a sale, lease or other disposition of any of the Collateral.

> d)    All proceeds (including insurance proceeds) from the sale, destruction, loss or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from the party's insurer, whether due to judgment, settlement or other process.

> e)    All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche or electronic media, together with all of Borrower's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media.

3.    **CROSS-COLLATERALIZATION; FUTURE ADVANCES.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender (or an affiliate of Lender), or any one or

Plaintiff's Complaint
Ex. D
Page 1 of 15

more of them, as well as all claims by Lender (or an affiliate of Lender) against Borrower or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Borrower may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.  In addition to the Note, this Agreement secures all future advances made by Lender to Borrower regardless of whether the advances are made (i) pursuant to a commitment, or (ii) for the same purposes.

**4.  BORROWER'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.**  With respect to the Collateral, Borrower represents and promises to Lender that:

a) **Perfection of Security Interest.**  Borrower authorizes Lender to file one or more financing statements and such other documents as Lender may require and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral, including such filings as may be necessary or advisable to be made with the U.S. Patent and Trademark Office with regard to the Patents.  Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper if not delivered to Lender for possession by Lender.  Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement.  Lender may at any time, and without further authorization from Borrower, file a partial, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement.  Borrower will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.  Borrower promptly will notify Lender of any change in Borrower's name including any change to the assumed business names of Borrower.  This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.

b) **Notices to Lender.**  Borrower will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Borrower's name; (2) change in Borrower's assumed business name(s); (3) change in the management of Borrower or, if Borrower is a limited liability company, in the members or managers of Borrower; (4) change in the authorized signer(s); (5) change in Borrower's principal office address; (6) change in Borrower's state of organization; (7) conversion of Borrower to a new or different type of business entity; or (8) change in any other aspect of Borrower that directly or indirectly relates to any agreements between Borrower and Lender.  No change in Borrower's name or state of organization will take effect until after Lender has received notice.  Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of that certain Agreement and Plan of Merger, dated as of September 24, 2007, as amended (the "Merger Agreement"), by and among the Catcher Holdings, Inc., Borrower, and Huckleberry Acquisition Corporation, a wholly-owned subsidiary of Catcher Holdings, Inc. and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

c) **No Violation.**  The execution and delivery of this Agreement will not violate any law or agreement governing Borrower or to which Borrower is a party, and its articles of incorporation, bylaws, operating agreement or other organizational documents do not prohibit any term or condition of this Agreement.

d) **Enforceability of Collateral.**  To the extent Collateral consists of accounts, chattel paper or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral.  At the time any Account becomes subject to a security interest in favor of Lender, the Account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Borrower with or for the account debtor.  So long as this Agreement remains in effect, Borrower shall not, without Lender's prior written consent, compromise, settle, adjust or extend payment under or with regard to any such Accounts.  There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.  Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

Plaintiff's Complaint
Ex. D
Page 2 of 15

e)  **Location of the Collateral.** Except in the ordinary course of Borrower's business, Borrower agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Borrower's address shown above or in the Disclosure Schedule to the Loan Agreement, or at such other locations as are acceptable to Lender.  Upon Lender's request, Borrower will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Borrower's operations, including without limitation the following: (1) all real property Borrower owns or is purchasing; (2) all real property Borrower is renting or leasing; (3) all storage facilities Borrower owns, rents, leases or uses; and (4) all other properties where Collateral is or may be located.

f)  **Removal of the Collateral.**  Except in the ordinary course of Borrower's business, including the sales of inventory, Borrower shall not remove the Collateral from its existing location without Lender's prior written consent.  To the extent that the Collateral consists of vehicles or other titled property, Borrower shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Oregon or Washington, as applicable, without Lender's prior written consent.   Borrower shall, whenever requested, advise Lender of the exact location of the Collateral.

g)  **Transactions involving Collateral.**  Except for inventory sold or accounts collected in the ordinary course of Borrower's business, or as otherwise provided for in this Agreement or in connection with the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral.  While and Event of Default is continuing under this Agreement, Borrower may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business.  A sale of inventory in the ordinary course of Borrower's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale.  Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than Permitted Liens (as defined in the Loan Agreement), the lien of this Agreement and security interests disclosed to Lender in the Loan Agreement, without the prior written consent of Lender.  This includes security interests even if junior in right to the security interests granted under this Agreement.  Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition.  Upon receipt, Borrower shall immediately deliver any such proceeds to Lender.  Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement and any and all changes to Borrower associated therewith,  subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

h)  **Title.**  Borrower represents and warrants to Lender that Borrower holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for Permitted Liens (as defined in the Loan Agreement), the lien of this Agreement and security interests disclosed to Lender in the Business Loan Agreement between the parties dated of as the date hereof. (the "Loan Agreement")   No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented.  Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

i)  **Repairs and Maintenance.**  Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect.  Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

j)  **Inspection of Collateral.**  Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

k)  **Taxes, Assessments and Liens.**  Borrower will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any other of the Related Documents.  Borrower may withhold any such payment or may elect to contest any lien if Borrower is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral in not jeopardized in Lender's sole opinion.  If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Borrower shall deposit with Lender cash, or a sufficient corporate surety bond or other security satisfactory to Lender, in an amount adequate to provide for the discharge of any lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral.  In any contest Borrower shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral.  Borrower shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.  Borrower further agrees to furnish Lender with evidence that such taxes, assessments, and

Page 3 of 15 – COMMERCIAL SECURITY AGREEMENT

Plaintiff's Complaint
Ex. D
Page 3 of 15

governmental and other charges have been paid in full and in a timely manner. Borrower may withhold any such payment or may elect to contest any lien if Borrower is in good faith conducting any appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

l) **Compliance with Governmental Regulations.** Borrower shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's sole opinion, is not jeopardized.

m) **Hazardous Substances.** Borrower represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of a Hazardous Substance. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

n) **Maintenance of Casualty Insurance.** Borrower shall procure and maintain all risk insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender, no later than December 7, 2007. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Borrower will provide Lender with such loss payable or other endorsements as Lender may require. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

o) **Application of Insurance Proceeds.** Borrower shall promptly notify Lender of any loss or damage to the Collateral. Lender may make proof of loss if Borrower fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Borrower from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Borrower. Any proceeds which have not been disbursed within six (6) months after their receipt and which Borrower has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

p) **Insurance Reserves.** Lender may require Borrower to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Borrower of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Borrower shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Borrower as they become due. Lender does not hold the reserves funds in trust for Borrower, and Lender is not the agent of Borrower for payment of the insurance premiums required to be paid by Borrower. The responsibility for the payment of premiums shall remain Borrower's sole responsibility.

q) **Insurance Reports.** Borrower, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risk insured; (3) the amount of the policy; (4) the property insured; (5) the then current value of the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Borrower shall upon request by Lender (however not more often than

Plaintiff's Complaint
Ex. D
Page 4 of 15

annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

### WARNING

Unless Borrower provides Lender with evidence of the insurance coverage as required herein, Lender may purchase insurance at Borrower's expense to protect Lender's interest. This insurance may, but need not, also protect Borrower's interest. If the Collateral becomes damaged, the coverage Lender purchases may not pay any claim Borrower makes or any claim made against Borrower. Borrower may later cancel this coverage by providing evidence that Borrower has obtained property coverage elsewhere.

Borrower is responsible for the cost of any insurance purchased by Lender. The cost of this insurance may be added to the Note balances. If the cost is added to the Note balances, the interest rate on the Notes will apply to this added amount. The effective date of coverage may be the date Borrower's prior coverage lapsed or the date Borrower failed to provide proof of coverage.

The coverage Lender purchases may be considerably more expensive than insurance Borrower can obtain on Borrower's own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.

5.   **BORROWER'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until the occurrence of an Event of Default and except as otherwise provided below with respect to accounts and above in the paragraph titled "Transactions Involving Collateral", Borrower may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Borrower's right to possession and beneficial use shall not apply to any collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Unless otherwise notified by Lender, Borrower may collect any of the Collateral consisting of accounts. Upon the occurrence and during the continuation of any Event of Default, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for the application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Borrower shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Borrower shall not itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

6.   **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging and paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (3) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence and during the continuation of any Event of Default.

7.   **PREFERENCE PAYMENTS.** Any monies Lender pays because of an asserted preference in Borrower's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Borrower as provided in this Agreement.

8.   **DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement.

    a)   **Payment Default.** Borrower fails to make any payment within five (5) calendar days when due under the Indebtedness.

    b)   **Other Defaults.** Borrower fails to comply with or to perform any other term, obligations, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term,

Page 5 of 15 – COMMERCIAL SECURITY AGREEMENT

Plaintiff's Complaint
Ex. D
Page 5 of 15

obligation, covenant or condition contained in any other agreement between Lender and Borrower. If any failure, other than a failure to pay money, is curable and if Borrower has not been given a notice of a similar breach within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower, after delivery of written notice from Lender demanding cure of such failure: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance within sixty (60) days after notice is sent.

c)  **Default in Favor of Third Parties.** Failure of Borrower to comply with or to perform any other term, obligation, covenant, or condition contained in any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Indebtedness or perform their respective obligations under this Agreement or any of the Related Documents.

d)  **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading in any material respect at any time thereafter.

e)  **Bankruptcy.** The dissolution of Borrower (regardless of whether election to continue is made), or any other termination of Borrower's existence as a going business, or the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower. Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

f)  **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any Collateral securing the Indebtedness.

g)  **Adverse Change.** A material adverse change occurs in Borrower's financial condition.

9.  **RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs and is continuing under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Oregon Uniform Commercial Code. In addition, and without limitation, Lender may exercise any one or more of the following rights and remedies:

a)  **Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment charge which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower. In the case of an Event of Default of the type described in the "Bankruptcy" subsection above, such acceleration shall be automatic and not optional

b)  **Assemble Collateral.** Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

c)  **Sell the Collateral.** Lender shall have full power to sell, lease, transfer or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral are to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least thirty (30) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing, for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from the date of expenditure until repaid.

Page 6 of 15 – COMMERCIAL SECURITY AGREEMENT

Plaintiff's Complaint
Ex. D
Page 6 of 15

d) **Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

e) **Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

f) **Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

g) **Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

h) **Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under this Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare an Event of Default and exercise its remedies.

10. **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

a) **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

b) **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help collect this Agreement, and Borrower shall pay the costs and expenses of such enforcement. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for arbitration or bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

c) **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

d) **Assignments.** Borrower acknowledges that Lender may sell and assign its interest in the Indebtedness, the payments due thereunder and the Collateral, in whole or in part, or sell participations therein, to an assignee (the "Assignee") which may be represented by a bank or trust company acting as a trustee of such Assignee. BORROWER ACKNOWLEDGES THAT ANY ASSIGNMENT OR TRANSFER BY LENDER OR ANY ASSIGNEE SHALL NOT MATERIALLY CHANGE BORROWER'S OBLIGATIONS UNDER THIS AGREEMENT. Any Assignee shall be entitled to enforce all the rights so assigned but be under no obligation to Borrower to

Plaintiff's Complaint
Ex. D
Page 7 of 15

perform any of Lender's obligations under this Agreement, the sole remedy of Borrower being against Lender with Borrower's right against Lender being unaffected except as provided herein. Borrower agrees that upon notice of assignment of the Indebtedness, it shall pay directly to the Assignee, unconditionally, all amounts which become due hereunder. Borrower specifically covenants and agrees that it will not assert against any Assignee any claims by way of abatement, defense, set-off, counterclaim, recoupment or otherwise which Borrower may have against Lender or any third party, and BORROWER SHALL NOT ASSERT AGAINST SUCH ASSIGNEE IN ANY ACTION FOR PAYMENTS OR OTHER MONEYS PAYABLE HEREUNDER ANY DEFENSE EXCEPT THE DEFENSE OF PAYMENT TO SUCH ASSIGNEE. Upon Lender's request, Borrower will acknowledge to any assignee receipt of Lender's notice of assignment.

e)   **GOVERNING LAW. This Agreement will be governed by, construed and enforced in accordance with the laws of the State of Oregon. This Agreement has been accepted by Lender in the State of Oregon. If there is a lawsuit, Borrower agrees to submit to the jurisdiction of the courts of Multnomah County, Oregon, or the U.S. District Court of the District of Oregon, as applicable.**

f)   **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower shall constitute a waiver of any of Lender's rights or of any of Borrower's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

g)   **Notices.** Any notice required to be given under the Agreement shall be given in writing, and shall be effective when actually delivered, when deposited with a reputable overnight courier for next business day delivery, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail with postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

h)   **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid, and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

i)   **Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Borrower irrevocably waives, disclaims and relinquished all claims against such other person which Borrower has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

j)   **Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness. Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

k)   **Survival of Representations and Warranties.** All representations, warranties and agreements made by Borrower in this Agreement and the Related Documents shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

l)   **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

Plaintiff's Complaint
Ex. D
Page 8 of 15

m) **Jury Waiver.** ALL PARTIES TO THIS AGREEMENT HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY.

**11. DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

a) **Account.** Accounts shall mean all "accounts," as such term is defined in the Code, now owned or hereafter acquired by Borrower, including: (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments) (including any such obligations that may be characterized as an account or contract right under the Code); (b) all of Borrower's rights in, to, and under, all purchase orders or receipts for goods or services; (c) all of Borrower's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods); (d) all rights to payment due to Borrower for Goods or other property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, or for services rendered or to be rendered by Borrower or in connection with any other transaction (whether or not yet earned by performance on the part of Borrower); (e) all health care insurance receivables; and (f) all collateral security of any kind given by any Account Debtor or any other Person with respect to any of the foregoing.

b) **Account Debtor.** Account Debtor shall mean any Person who is or may become obligated with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a Payment Intangible).

c) **Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to the Commercial Security Agreement from time to time.

d) **Books and Records.** Books and Records shall mean all books, records, board minutes, contracts, licenses, insurance policies, environmental audits, business plans, files, computer files, computer discs and other data and software storage and media devices, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities, and any and all records and instruments relating to the Collateral or Borrower's business.

e) **Borrower.** The word "Borrower" means the person designated as such on the first page of this Agreement and all other persons and entities signing the Note in whatever capacity.

f) **Chattel Paper.** Chattel Paper shall mean all "chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by any Person.

g) **Code.** Code shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Oregon.

h) **Collateral.** The word "Collateral" means all of Borrower's right, title and interest in and to all the Collateral as described in Section 2 of this Agreement.

i) **Contracts.** Contracts shall mean all the contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which the Borrower may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

j) **Copyright License.** Copyright License shall mean rights under any written agreement now owned or hereafter acquired by the Borrower granting the right to use any Copyright or Copyright registration of any Person.

k) **Copyrights.** Copyrights shall mean all of the following now owned or hereafter acquired by any Person: (a) all copyrights in any original work of authorship fixed in any tangible medium of expression, now known or later developed, all registrations and applications for registration of any such copyrights in the U.S. Copyright Office or any other country, including registrations, recordings and applications, and supplemental registrations, recordings, and applications in the U.S. Copyright Office; and (b) all Proceeds of the foregoing, including license

Plaintiff's Complaint
Ex. D
Page 9 of 15

royalties and proceeds of infringement suits, the right to sue for past, present and future infringements, all rights corresponding thereto throughout the world and all renewals and extensions thereof.

l) **Deposit Accounts.** Deposit Accounts shall have the meaning as such term is defined in the Code, now or hereafter held in the name of the Borrower.

m) **Documents.** Documents shall have the meaning as such term is defined in the Code, now owned or hereafter acquired by any Person, wherever located, including all bills of lading, dock warrants, dock receipts, warehouse receipts, and other documents of title, whether negotiable or non-negotiable.

n) **Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1808, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto or intended to protect human health or the environment.

o) **Event of Default.** The words "Event of Default" mean any of the events of default set forth in Section 8 of this Agreement.

p) **General Intangibles.** General Intangible shall have the meaning as such term is defined in the Code, now owned or hereafter owned by the Borrower, including all right, title and interest that the Borrower may now or hereafter have in or under any Contract, all Payment Intangibles, customer lists, Licenses, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials, Books and Records, Goodwill (including  the Goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key-person, and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit accounts, rights to receive tax refunds and other payments, rights to received dividends, distributions, cash, Instruments and other property, and rights of indemnification.

q) **Goods.** Goods shall have the meaning as such term is defined in the Code, now owned or hereafter owned by the Borrower, wherever located, including equipment and embedded software to the extent included in "goods" as defined in the Code.

r) **Goodwill.**    Goodwill shall mean all goodwill, trade secrets, proprietary or confidential information, technical information, procedures, formulae, quality control standards, designs, operating and training manuals, customer lists, and distribution agreements now owned or hereafter owned by the Borrower

s) **Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quality, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

t) **Indebtedness.** Indebtedness shall mean the indebtedness evidenced by the Note, including all principal and interest, together with all other indebtedness and costs, expenses or trade obligations for which Borrower is responsible under this Agreement or under any of the Related Documents. In addition, the term "Indebtedness" includes all other obligations, debts and liabilities, plus interest thereon, of Borrower, or any one or more of them, to the Lenders, as well as all claims by the Lenders against Borrower, or any one or more of them, whether existing now or later; whether they are voluntary or involuntary, due or not due, direct or indirect, absolute or contingent, liquidated or unliquidated, whether Borrower may be liable individually or jointly with others; whether Borrower may be obligated as guarantor, surety, accommodation party or otherwise, whether recovery upon such indebtedness may be or hereafter may become barred by any statute of limitations, and whether such indebtedness may be or hereafter may become otherwise unenforceable.

u) **Instruments.** Instruments shall have the meaning as such term is defined in the Code, now owned or hereafter owned by any Person, wherever located, including all certificated securities and all notes and other evidences of

Plaintiff's Complaint
Ex. D
Page 10 of 15

indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper, including without limited the Parent Loan Document referred to in Section 2 of the Loan Agreement.

v)    **Intellectual Property.** Intellectual Property shall mean any and all Licenses, Copyrights, Patents, Trademarks, Trade Secrets and customer lists.

w)    **Inventory.** Inventory shall have the meaning as such term is defined in the Code, now owned or hereafter owned by the Borrower, wherever located, including all inventory, merchandise, goods and other personal property that are held by or on behalf of the Borrower for sale or lease or are furnished or are to be furnished under a contract of service or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in the Borrower's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

x)    **Investment Property.** Investment Property shall have the meaning as such term is defined in the Code, now or hereafter acquired by any Person, wherever located.

y)    **License.** License shall mean any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter held by any Person.

z)    **Note.** The word "Note" means the Note executed by Borrower in the maximum principal amount of $1,000,000 of even date herewith, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

aa)   **Patents.** Patents shall mean all of the following in which any Person now holds or hereafter holds any interest: (a) all Patent Applications; (b) all letters patent of any country and all registrations and recordings thereof; (c) all reissues, continuations, continuations-in-part or extensions thereof, including without limitation the patents and patent applications listed on **Schedule 1 – Current Patent and Patent Applications**; (d) any patent claiming an invention disclosed by any of the foregoing; and (e) any right or chose in action relating to the foregoing, whether arising before or after the date hereof.

bb)   **Payment Intangibles.** Payment Intangibles shall mean as such term is defined in the Code, now owned or hereafter owned by any Person.

cc)   **Person.** Person shall mean an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or governmental authority.

dd)   **Proceeds.** Proceeds shall have the meaning as such term is defined in the Code and, in any event, shall include: (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any Collateral; (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority); (c) any recoveries by the Borrower against third parties with respect to any litigation or dispute concerning any Collateral, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral; (d) all amounts collected on, or distributed on account of, other Collateral; and (e) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

ee)   **Property.** The word "Property" means all of Borrower's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

ff)    **Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements and loan agreements (including without limitation the Credit Agreement), environmental agreements, guaranties, security agreements, stock pledge agreements, mortgages, deeds of trust, security deeds, collateral mortgages and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Note.

gg)   **Supporting Obligations.** Supporting Obligations shall have the meaning as such term is defined in the Code, including letters of credit and guaranties issued in support of Accounts, Chattel Paper, Documents, General Intangibles, Instruments, or Investment Property.

Plaintiff's Complaint
Ex. D
Page 11 of 15

hh) **Trademark License.** Trademark License shall mean the rights under any written agreement now held or hereafter held by any Person granting any right to use any Trademark or Trademark registration.

ii) **Trademarks.** Trademarks shall mean all of the following now owned or hereafter owned by any Person: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or Territory hereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

jj) **Trade Secrets.** Trade Secrets shall mean all proprietary information, including formulas, patterns, compilations, programs, devices, methods, techniques or processes that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use, all whether now owned or hereafter owned by any Person.

UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY LENDER AFTER OCTOBER 3, 1989 CONCERNING LOANS AND OTHER CREDIT EXTENSIONS MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY LENDER TO BE ENFORCEABLE.

BORROWER ACKNOWLEDGES HAVING READ ALL OF THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND BORROWER AGREES TO ITS TERMS.

BORROWER:

VIVATO NETWORKS, INC.

By: _Gary Haycox_
Name: GARY HAYCOX
Title: CEO

AUTHORIZED AND APPROVED:

CATCHER HOLDINGS, INC.

By: _Denis E McCarthy_
Name: DENIS McCARTHY
Title: CFO

CATCHER, INC.

By: _Denis E McCarthy_
Name: DENIS McCARTHY
Title: CEO

Plaintiff's Complaint
Ex. D
Page 12 of 15

**Schedule 1 – Current Patent and Patent Applications**

| Vivato Networks | | | |
|---|---|---|---|
| 10 Issued, 9 Pending | | | |
| B & C File No. | Lee &Hayes File No. | Title | Status |
| 760.0000001 | NA | General Matter | *Assignment changing name from Wayout Wireless to Vivato Networks LLC mailed 08/02/07.* |
| 760.0017631 | NA | Go Network Due Diligence | |
| 760.0020001 | MN1-0025US | | Filed 09/25/2006. Serial No. 11/526,543 Replacement Drawings filed 11/08/06. Updated Filing Receipt received 11/29/06. |
| 760.002999P | MN1-0025USP1 | APPLICATION OF MULTIPLE BEAM ANTENNA SYSTEM TO 802.16 BASE STATIONS | Filed 09/23/2005 Serial No. 60/719,856 |
| 760.0030001 | MN1-0001US | IMPROVED MULTIPATH COMMUNICATION METHODS AND APPARATUSES | Filed 04/25/2002 Serial No. 10/131,864 ISSUED 7,177,369 on 02/13/2007 |
| 760.003999P | MN1-0001USP1 | IMPROVED MULTIPATH COMMUNICATION METHODS AND ARRANGEMENTS | Filed 04/27/2001 Serial No. 60/287,163 |
| 760.0040001 | MN1-0003US | EPLANE OMNIDIRECTIONAL ANTENNA | Filed 12/31/2002 Serial No. 10/335,382 ISSUED 6,967,625 on 11/22/2005 |

| | | | |
|---|---|---|---|
| 760.0040002 | MN1-0003USC1 | EPLANE OMNIDIRECTIONAL ANTENNA | Filed 04/13/2005 Serial No. 11/104,684 DIV of 10/335,382 ISSUED 7,256,750 on 08/14/2007 Issue Fee Paid 7/2/2007 *Issue Notification Received 07/31/2007.* |
| 760.0050001 | MN1-0004US | COMPLEMENTARY BEAMFORMING TECHNIQUES | Filed 11/03/2003 Serial No. 10/700,991 ISSUED 7,099,698 on 08/29/2006 |
| 760.0050002 | MN1-0004USC1 | COMPLEMENTARY BEAMFORMING TECHNIQUES | Filed 05/12/2006 Serial No. 11/383,167 CON of 10/700,991 Pending, No first Office Action |
| 760.005999P | MN1-0004USP1 | COMPLEMENTARY BEAMFORMING TECHNIQUES | Filed 11/03/2002 Serial No. 60/423,703 |
| 760.0060001 | MN1-0010US | DIRECTED WIRELESS COMMUNICATION | Filed 11/03/2003 Serial No. 10/700,329 Office Action received 09/28/2006. Response mailed 10/18/2006. *Final Office Action Received 07/20/2007. Response Due 09/17/2007 (2 months).* |

Plaintiff's Complaint
Ex. D
Page 13 of 15

| 760.006999 P | MN1-0010USP1 | A WIRELESS DATA PACKET COMMUNICATIONS SYSTEM | Filed 11/04/2002 Serial No. 60/423,660 |
| 760.0070001 | MN1-0013US | DETECTING WIRELESS INTERLOPERS | Filed 10/07/2003 Serial No. 10/680,965 Pending, No first Office Action |
| 760.0080001 | MN1-0006US | ANTENNA ASSEMBLY | Filed 09/09/2003 Serial No. 10/658,346 ISSUED. 6,995,725 on 02/07/2006 |
| 760.0080002 | MN1-0006USC1 | ANTENNA ASSEMBLY | Filed 02/06/2006 Serial No. 11/ 275,950 a con of 10/658,346 *Election mailed 07/09/2007. Response submitted 08/03/2007.* |
| 760.008999P | MN1-0006USP1 | ANTENNA ASSEMBLY | Filed 11/04/2002 Serial No. 60/423,700 |
| 760.0090001 | MN1-0017US | IMPROVED LAYERED PROCESSING | Filed 09/18/2004 Serial No. 10/944,376 Pending, No first Office Action |
| 760.009999P | MN1-0017USP1 | OPTIMUM LAYERED PROCESSING | Filed 09/18/2003 Serial No. 60/503,852 |
| 760.0100001 | MN1-0014US | FORCED BEAM SWITCHING IN WIRELESS COMMUNICATION | Filed 10/31/2003 Serial No. 10/698,848 ISSUED 7,062,296 on 06/13/2006 |

| 760.0100002 | MN1-0014USC1 | FORCED BEAM SWITCHING IN WIRELESS COMMUNICATION | Filed 05/30/2006 Serial No. 11/420,860 a con of 10/698,848 Pending, No first Office Action |
| 760.0110001 | MN1-0011US | | Closed |
| 760.011999P | MN1-0011USP1 | MULTIMAC CONTROL TECHNIQUES | Filed 11/04/2002 Serial No. 60/423,696 |
| 760.0120001 | MN1-0008US | SIGNAL COMMUNICATION COORDINATION | Filed 11/03/2003 Serial No. 10/700,342 Pending, No first Office Action |
| 760.012999P | MN1-0008USP1 | SYNCHRONIZING MEDIA ACCESS CONTROL (MAC) CONTROLLERS | Filed 11/04/2002 Serial No. 60/423,702 |
| 760.0130001 | 2502881-991101 | WIRELESS COMMUNICATION SYSTEM WITH DIRECTIONAL ANTENNA | Filed 08/05/2005 Serial No. 11/198,016 Pending, No first Office Action |
| 760.013999P | 2502881-991100 | WIRELESS COMMUNICATIONS SYSTEM USING DIRECTIONAL ANTENNAS | Filed 08/05/2004 Serial No. 60/599,743 |
| 760.0140001 | MN1-0002US | WIRELESS PACKET SWITCHED COMMUNICATION SYSTEMS AND NETWORKS... | Filed 10/12/2001 Serial No. 09/976,246 ISSUED 6,611,231 on 08/26/2003 2/14/2007 Maintenance Fee for year 3.5 paid. |

Plaintiff's Complaint
Ex. D
Page 14 of 15

| 760.0140002 | MN1-0002USC1 | WIRELESS PACKET SWITCHED COMMUNICATION SYSTEMS AND NETWORKS... | Filed 09/04/2002 Serial No. 10/235,198 Cont. of Pat. No. 6,611,231 ISSUED 6,970,682 on 11/29/2005 |
| 760.0150001 | MN1-0005US | WIRELESS COMMUNICATION AND BEAM FORMING WITH PASSIVE BEAMFORMERS | Filed 03/07/2003 Serial No. 10/384,308 ISSUED. 6,992,621 on 01/31/2006 |
| 760.0160001 | MN1-0019US | ELECTROMAGNETIC LENS | Filed 01/16/2004 Serial No. 10/760,023 ISSUED 6,980,169 on 12/27/2005 |
| 760.0170001 | | | Unfiled Closed |
| 760.0180001 | | | Unfiled Closed |
| 760.019999P | MN1-0009US | COMMUNICATING BROADCAST FRAMES | Filed 11/04/2002 Serial No. 60/423,701 Abandoned |
| 760.0200001 | MN1-0015US | | Unfiled Closed |
| 760.0210001 | MN1-0016US | | Unfiled Closed |
| 760.0220001 | MN1-0018US | | Unfiled Closed |
| 760.0230001 | MN1-0020US | | Unfiled Closed |

| 760.0240001 | MN1-0021US | | Unfiled Closed |
| 760.0250001 | MN1-0022US | | Unfiled Closed |
| 760.0260001 | MN1-0023US | | Unfiled Closed |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Plaintiff's Complaint
Ex. D
Page 15 of 15

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Shari Arthurs                              3606932424

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
BULLIVANT HOUSER BAILEY PC

805 BROADWAY STREET, SUITE 400


VANCOUVER WA 98660
```

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 01:59 PM 11/30/2007*
*INITIAL FILING # 2007 4531173*

*SRV: 071271714*

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| VIVATO NETWORKS, INC. | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 322 NW SIXTH AVENUE, SUITE 100 | PORTLAND | OR | 97209 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AEQUITAS CAPITAL MANAGEMENT, INC. | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5300 MEADOWS ROAD, SUITE 400 | LAKE OSWEGO | OR | 97035 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

Collateral Description - please see attachment

**6.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum  [if applicable]  **7.** Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]  ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2

**8.** OPTIONAL FILER REFERENCE DATA

**Plaintiff's Complaint**
**Ex. E**
**Page 1 of 2**

## ATTACHMENT "A" TO UCC FINANCING STATEMENT

Pursuant to the Commercial Security Agreement entered into on November 30, 2007 between Vivato Networks, Inc., a Delaware corporation (the "Debtor") and Aequitas Capital Management, Inc. (the "Secured Party") herein, the Secured Party is hereby granted to secure all of Debtor's right, title and interest in and to all of the following property:

All cash, accounts receivable, notes receivable, contract rights, deposits, securities, investments, chattel paper, documents, instruments, patents, patent applications, trade secrets, trademarks, Tradenames, copyrights, general intangibles, inventory, raw materials, work in progress, finished goods, furnishings, fixtures, trade fixtures, equipment, machinery, motor vehicles and all other personal property, assets or rights of whatever nature now owned or hereafter acquired by Borrower and products and proceeds thereof, including all Goods, all Accounts, all General Intangibles, all Deposit Accounts, all Equipment, all Inventory, all Intellectual Property, all books and records pertaining to the Collateral, Chattel Paper, Instruments, Investment Property, Letter-of-Credit Rights, Documents, and to the extent not otherwise included, all Proceeds, Supporting Obligations and products pertaining to any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

**Plaintiff's Complaint
Ex. E
Page 2 of 2**

USPTO. EPAS. Receipt                                                                Page 1 of 3

 **United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



*Electronic Patent Assignment System*

# Confirmation Receipt

**Your assignment has been received by the USPTO.**
**The coversheet of the assignment is displayed below:**

| PATENT ASSIGNMENT |
|---|

Electronic Version v1.1
Stylesheet Version v1.1

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | SECURITY AGREEMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| Vivato Networks, Inc., formerly Vivato Networks, LLC | 11/30/2007 |

**RECEIVING PARTY DATA**

| Name: | Aequitas Capital Management, Inc. |
|---|---|
| Street Address: | 5300 Meadows Road |
| Internal Address: | Suite 400 |
| City: | Lake Oswego |
| State/Country: | OREGON |
| Postal Code: | 97035 |

**PROPERTY NUMBERS  Total: 19**

| Property Type | Number |
|---|---|
| Application Number: | 11526543 |
| Patent Number: | 7177369 |
| Patent Number: | 6967625 |
| Patent Number: | 7256750 |
| Patent Number: | 7099698 |
| Application Number: | 11383167 |
| Application Number: | 10700329 |
| Application Number: | 10680965 |

**Plaintiff's Complaint**
**Ex. F**
**Page 1 of 3**

| | |
|---|---|
| **Patent Number:** | 6995725 |
| **Application Number:** | 11275950 |
| **Application Number:** | 10944376 |
| **Patent Number:** | 7062296 |
| **Application Number:** | 11420860 |
| **Application Number:** | 10700342 |
| **Application Number:** | 11198016 |
| **Patent Number:** | 6611231 |
| **Patent Number:** | 6970682 |
| **Patent Number:** | 6992621 |
| **Patent Number:** | 6980169 |

**CORRESPONDENCE DATA**

Fax Number:              (916)930-2501
*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*
Phone:                   (916) 930-2500
Email:                   carl.schwedler@bullivant.com
Correspondent Name:      Carl J. Schwedler
Address Line 1:          1415 L Street
Address Line 2:          Suite 1000
Address Line 4:          Sacramento, CALIFORNIA   95814

| | |
|---|---|
| **ATTORNEY DOCKET NUMBER:** | 29988/00005 |
| **NAME OF SUBMITTER:** | Carl J. Schwedler |
| **Signature:** | /cjs/ |
| **Date:** | 11/30/2007 |

**Total Attachments: 15**
source=Commercial Security Agreement#page1.tif
source=Commercial Security Agreement#page2.tif
source=Commercial Security Agreement#page3.tif
source=Commercial Security Agreement#page4.tif
source=Commercial Security Agreement#page5.tif
source=Commercial Security Agreement#page6.tif
source=Commercial Security Agreement#page7.tif
source=Commercial Security Agreement#page8.tif
source=Commercial Security Agreement#page9.tif
source=Commercial Security Agreement#page10.tif
source=Commercial Security Agreement#page11.tif
source=Commercial Security Agreement#page12.tif
source=Commercial Security Agreement#page13.tif
source=Commercial Security Agreement#page14.tif
source=Commercial Security Agreement#page15.tif

**RECEIPT INFORMATION**

Plaintiff's Complaint
Ex. F
Page 2 of 3

USPTO. EPAS. Receipt

| EPAS ID: | PAT420362 |
|---|---|
| Receipt Date: | 11/30/2007 |
| Fee Amount: | $760 |

## Return to home page

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

Plaintiff's Complaint
Ex. F
Page 3 of 3